**U.S. Department of Justice**

*United States Attorney*
*Eastern District of New York*

NJM:EHS
F. #2024R00116

*271 Cadman Plaza East*
*Brooklyn, New York 11201*

January 20, 2026

By ECF

The Honorable Hector Gonzalez
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re: United States v. Sergei Zharnovnikov
Criminal Docket No. 25-45 (HG)

Dear Judge Gonzalez:

The government respectfully submits this letter in advance of the defendant Sergei Zharnovnikov's sentencing, which is scheduled for January 22, 2026. On June 25, 2025, the defendant pleaded guilty to one count of conspiracy to violate the Export Control Reform Act ("ECRA"). The defendant's advisory sentencing range under the United States Sentencing Guidelines ("U.S.S.G" or "Guidelines") is 46 to 57 months' imprisonment. The defendant was responsible for sending over $1,500,000 worth of advanced firearms and ammunition to Russia, some of which were known to be used by the Russian military and Russian intelligence. For this serious crime, the government respectfully recommends a sentence at the high end of the Guidelines range.

## I. Background[1]

### A. The Export Control Reform Act and Export Administration Regulations

On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included ECRA. *See* 50 U.S.C. § 4801 *et seq*. ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

[1] Unless otherwise noted, the following facts are taken from the Presentence Investigation Report ("PSR") dated November 20, 2025, and the factual record in this case.

ECRA provides that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items, and specified activities of United States persons, wherever located, be controlled." 50 U.S.C. § 4811. To that end, ECRA granted the President the authority to "(1) control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons; and (2) the activities of United States persons, wherever located, relating to specific categories of items and information. 50 U.S.C. § 4812. ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

Through the EAR and ECRA, the U.S. Department of Commerce (DOC)'s Bureau of Industry and Security ("BIS") reviews and controls the export from the United States to foreign destinations of certain items. In particular, BIS places restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Such restrictions depend on several factors, including the technical characteristics of the item, the destination country, the end user, and the end use of the item.

The most sensitive items are identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL are categorized by Export Control Classification Number ("ECCN"), each of which is subject to export control requirements depending on destination, end use, and end user of the item. The firearms at issue in the instant criminal scheme required a license for export during the time of the conspiracy under ECCN 0A501.a.

Since February 24, 2022, when Russia launched its invasion of Ukraine, BIS has implemented a series of stringent export controls that restrict Russia's access to technologies and other items that it needs to sustain its attack on Ukraine. As of April 8, 2022, license requirements for exports, reexports, and transfers to or within Russia were expanded to cover all items on the CCL. *See* 87 Fed. Reg. 12226 (Mar. 3, 2022); 87 Fed. Reg. 22130 (Apr. 14, 2022); 15 C.F.R. § 746.8.

Through the EAR, DOC also publishes the Entity List, which identifies certain foreign persons—including businesses, research institutions, government and private organizations, individuals, and other types of legal persons—that are subject to specific export license requirements and policies, in addition to those found elsewhere in the EAR, due to a determination that such persons had engaged in activities contrary to U.S. national security and/or foreign policy interests. *See* 15 C.F.R. § 744.11; 15 C.F.R. Part 744, Supp. No. 4 (the Entity List).

Under ECRA, it is a crime to willfully violate, attempt to violate, conspire to violate, or cause a violation of any regulation, order, license, or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(1).

Additionally, an exporter of goods from the United States is required to file information with the U.S. government about the intended exports under certain circumstances. Specifically, an exporter is required to file Electronic Export Information ("EEI") through the Automated Export System when, among other reasons, an export license was required, or the value of the commodity being exported was more than $2,500. 15 C.F.R. § 758.1. The EEI requires an

exporter to list, among other things, the destination country, the ultimate consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported. Failure to file EEI or providing false or misleading information in EEI is a violation of ECRA (*see, e.g.*, 50 U.S.C. 4819(a)(2)(F)), the EAR (*see* 15 C.F.R. Part 758), 13 U.S.C. § 305, and the Foreign Trade Regulations (*see* 15 C.F.R. Par 30).

B. Overview of the Criminal Scheme

Between March 2020 and January 2025 when he was arrested, the defendant, together with others, exported from the United States to Russia, firearms and ammunition which required a license from DOC, without the requisite license. PSR ¶¶ 18, 34. The defendant is an international arms dealer and General Director and owner of an arms dealing company in Bishkek, Kyrgyzstan ("Kyrgyz Arms Dealing Company-1"), whose wife owns a second arms dealing company in Kyrgyzstan ("Kyrgyz Arms Dealing Company-2"). *Id.* ¶¶ 12, 15. Using Kyrgyz Arms Dealing Companies-1 and -2, the defendant exported over $1,500,000 worth of U.S.-manufactured firearms and ammunition from the United States to Russia. *Id.* ¶ 19. The defendant profited approximately ten percent of the overall value of the items he illegally exported, netting a sizable personal profit of approximately $150,000 from this known weapons trafficking alone. *Id.*[2]

1. The Illegal Reexport of U.S. Company-1 Rifle-Pistols

As explained in detail below, in one transaction, the defendant entered into a five-year, $900,000 contract with a company in the United States ("U.S. Company-1")[3] to purchase and export U.S. Company-1 firearms to Kyrgyzstan. DOC issued a license for U.S. Company-1 to export firearms to Kyrgyz Arms Dealing Company-1, but the license prohibited the export or reexport of the firearms to Russia. Nevertheless, the defendant reexported U.S. Company-1 semi-automatic hybrid rifle-pistols to Russia without a license.

Specifically, on or about February 2, 2020, Kyrgyz Arms Dealing Company-1 entered into a contract with U.S. Company-1, wherein U.S. Company-1 would sell Kyrgyz Arms Dealing Company-1 "hunting shotguns and rifles, pistols, spare parts and accessories" (hereinafter the "U.S. Company-1 Contract"). The length of the contract was for five years. *Id.* ¶ 21. The defendant signed the U.S. Company-1 Contract on behalf of Kyrgyz Arms Dealing Company-1. *Id.* The next day, U.S. Company-1 received an export license from DOC to export over $800,000 worth of firearms and parts to Kyrgyz Arms Dealing Company-1. *Id.* ¶ 22. The license stated that

---

[2] The defendant, through counsel, notified the government of two transactions in which the defendant paid for U.S. goods but did not receive the goods. The government is working to administratively forfeit money or goods that are part of the criminal scheme, as appropriate.

[3] U.S. Company-1, headquartered in Virginia, specializes in the design, manufacturing, and distribution of firearms and firearm-related products. U.S. Company-1 firearms are renowned for their designs, including the company's flagship offering, a firearm engineered to minimize recoil and muzzle climb, thereby enhancing precision and control, particularly during rapid fire. U.S. Company-1 sells a diverse range of firearms and accessories that serve the needs of military units, among others. *Id.* ¶ 16.

items within the scope of the license "may not be reexported or transferred (in-country)," subject to certain exceptions not applicable here. *Id.* In connection with the license application, U.S. Company-1 submitted a "Letter of Explanation" to DOC stating that Kyrgyz Arms Dealing Company-1 was the ultimate foreign consignee in Kyrgyzstan, and that Kyrgyz Arms Dealing Company-1 would sell the proposed firearms shipments to "civilian end users for hunting, target shooting and competition purposes, in accordance with local regulations." *Id.*

Subsequently, Kyrgyz Arms Dealing Company-2, the company owned by the defendant's wife, entered into a contract with a Russian arms dealer located in Moscow, Russia ("Russian Arms Dealing Company-1"). *Id.* ¶ 23. Russian Arms Dealing Company-1 described itself as the "partner company" of Kyrgyz Arms Dealing Company-1. The contract articulated that Kyrgyz Arms Dealing Company-2 would sell "Goods" to Russian Arms Dealing Company-1 in the amount of $10 million USD. *Id.* The investigation revealed that the "Goods" described in this contract included the firearms that the defendant acquired on behalf of Kyrgyz Arms Dealing Company-1 pursuant to the U.S. Company-1 Contract. *Id.*

Based on the investigation, Kyrgyz Arms Dealing Company-1 was the defendant's company that transacted with U.S. companies, while Kyrgyz Arms Dealing Company-2, which is owned by the defendant's wife, was the company that transacted with Russian companies. *Id.* ¶ 24. Criminals who seek to evade U.S. export control laws will often use separate companies, like Kyrgyz Arms Dealing Company-1 and -2, to obfuscate from U.S. companies and authorities the true end destination of the goods being exported. *Id.*[4]

---

[4] As to the defendant's knowledge, the defendant signed an end use certification in connection with a separate license for U.S. Company-1 to export firearms and parts to Kyrgyz Arms Dealing Company-1, which he provided to U.S. Company-1, that read:

> [Kyrgyz Arms Dealing Company-1], a company registered for doing business in Kyrgyz Republic, agrees and understands that the products to be imported are authorized by the U.S. Government for export only to Kyrgyz Republic for the use of [Kyrgyz Arms Dealing Company-1] under the proposed license. They may not be resold, diverted, transferred or otherwise be disposed of to any other country, either in their original form or after being incorporated into other end items, without first obtaining approval from the U.S. Department of Commerce or use of an applicable exemption.
>
> The listed firearms and parts ordered from [U.S. Company-1] will be used for commercial resale and warranties within Kyrgyz Republic for of sporting and hunting.

*Id.* ¶ 25.

After receiving money from Russian Arms Dealing Company-1, the defendant instructed his associate ("Individual-1") to transfer the money from Kyrgz Arms Dealing Company-2 to Kyrgz Arms Dealing Company-1, and then to U.S. Company-1. *Id.* ¶ 26. The defendant emailed Indivdiual-1 a commercial invoice from U.S. Company-1 with invoice number 110021 (hereinafter the "U.S. Company-1 Invoice"). *Id.* ¶ 27. The U.S. Company-1 Invoice listed, among other things, 25 "[U.S. Company-1] Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)" with 25 unique serial numbers. *Id.* This type of firearm is a semi-automatic hybrid rifle-pistol. *Id.*

The U.S. Company-1 Invoice included the following "Destination Control Statement":

> These items are controlled by the U.S. government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any person other than the authorized ultimate consignee or end-user(s), either in their original form or after being incorporated into other items, without first obtaining approval from the U.S. government or otherwise authorized by U.S. law and regulations.

*Id.* ¶ 28.

According to an EEI filing made on or about July 7, 2022, Company-1 exported semi-automatic rifles to Kyrgyz Arms Dealing Company-1 pursuant to its February 3, 2021 export license on or about July 10, 2022. *Id.* ¶ 30. The port of export was John F. Kennedy International Airport, located in the Eastern District of New York. *Id.* According to the EEI filing, the value of the export from U.S. Company-1 to Kyrgyz Arms Dealing Company-1 was over $59,000. *Id.* The EEI filing's corresponding license application indicated that the firearms were for "commercial resale in Kyrgyzstan." *Id.* The license stated:

> Items subject to the EAR and within the scope of this license may not be reexported or transferred (in country) unless such reexport or in-country transfer is (i) authorized by this license, or another license or other approval issued by the U.S. Government; (ii) authorized by a license exception or other authorization under the Export Administration Regulations (EAR); or (iii) to a destination, end user, and end use that would be "NLR" (No License Required) under the EAR.

*Id.*

A Kyrgyz import document, located in the defendant's email account, details the import of the firearms listed on the U.S. Company-1 Invoice, including the 25 serial numbers matching the U.S. Company-1 Invoice and the matching description as 25 "[U.S. Company-1]: Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)," into Kyrgyzstan. *Id.* ¶ 31.

Email records reflect that the defendant sold the rifle pistols to Russia. Specifically, on or about August 8, 2022, the defendant's wife emailed the defendant an excel spreadsheet titled in the Russian language, "Supply [U.S. Company-1] ([Russian Arms Dealing Company-1]) weapon numbers." *Id.* ¶ 32. Again, Russian Arms Dealing Company-1 is a Russian company, and the DOC license did not authorize the export or reexport of the U.S. Company-1 firearms to Russia. *Id.* The spreadsheet contained two columns, "Name" and "Number." The Name column listed "[U.S. Company-1]: Rifle / Semi-auto / 16" BRL / 1x10 rd mag / Cal 45ACP / BLK (MD)," *i.e.*, matching the description in the U.S. Company-1 Invoice, and the Number column listed 25 serial numbers, again matching the U.S. Company-1 Invoice. *Id.*

The General Director of Russian Arms Dealing Company-1 ("Co-Conspirator-1") executed a "DECLARATION OF IMPORT OF GOODS AND PAYMENT OF INDIRECT TAXES" (the "Import Declaration"), a form used between tax authorities of the member states of the Eurasian Economic Union, which includes both Kyrgyzstan and Russia. *Id.* ¶ 33. The Import Declaration was located in the defendant's email account. *Id.* ¶ 32. The Import Declaration listed the seller as Kyrgyz Arms Dealing Company-2 and the buyer as Russian Arms Dealing Company-1 with an address in Moscow, Russia and identified the goods as 25 "[U.S. Company-1] Rifle/Semiauto/16" BRL/1*10rd mag/Cal 45ACP/BLK (MD)," *i.e.*, the same semi-automatic rifle-pistols that U.S. Company-1 exported to Kyrgyz Arms Dealing Company-1, the defendant's company, in Kyrgyzstan. *Id.* As of January 2025, Russian Company-1's website indicated that it sold U.S. Company-1 firearms. *Id.* ¶13.

The defendant did not apply for, obtain, or possess a license to export or reexport the semi-automatic pistol-rifles to Russia. *Id.* ¶ 34.

2. <u>The Illegal Reexport of U.S. Company-2 Rifles</u>

In another transaction, the defendant reexported five rifles from a second U.S. Company ("U.S. Company-2")[5] to Russia, via Kyrgyzstan. Here too, the DOC license prohibited the rifles from being reexported out of Kyrgyzstan.

Specifically, the defendant sent Co-Conspirator-1 a PDF of an air waybill depicting a shipment from U.S. Company-2 to a Kyrgyzstan-based company ("Kyrgz Company-3"). *Id.* ¶ 35. The next day, Co-Conspirator-1 messaged the defendant in Russian,[6] "I would like to know when approximately the [U.S. Company-2 shipment] will arrive." *Id.* ¶ 36. In response, the defendant sent Co-Conspirator-1 a screenshot of a Turkish airlines flight schedule. *Id.* The same day, Co-Conspirator-1 instructed the defendant in Russian, "Give me serial numbers for [U.S. Company-2] and [U.S. Company-1] please." *Id.* Several days later, the defendant's wife emailed the defendant an excel file containing the serial numbers of five U.S. Company-2 rifles. *Id.* Based

[5] U.S. Company-2, headquartered in Utah, specializes in manufacturing innovative, high-precision, and compact bullpup (*i.e.*, short barrel) rifles and munitions. *Id.* ¶ 17. U.S. Company-2's website advertises that it provides firearms to law enforcement agencies around the world. *Id.*

[6] Russian-language documents are draft translations.

on U.S. Company-2 records, each of these serial numbers matched the five rifles sold to Kyrgyz Company-3 and shipped on or about June 30, 2022. *Id.* Also according to U.S. Company-2, these five rifles were worth approximately $30,000. *Id.*

Subsequently, Co-Conspirator-1 sent "Melissa," an alias for the defendant's wife, an invoice for five U.S. Company-2 rifles from Kyrgyz Arms Dealing Company-2 to Russian Arms Dealing Company-1, further demonstrating that the U.S. Company-2 rifles were reexported to Russia. *Id.* ¶ 37.

### 3. <u>Russian Snipers' Use of U.S. Company-2 Rifles</u>

Russian investigative reporting indicates that a Russian state broadcaster aired footage of Russian military snipers using U.S. Company-2 rifles, with the phrase "Za Россию" ("For Russia") inscribed on the side of the rifle.[7] *Id.* ¶ 38. Notably, the letter Z does not exist in the Cyrillic alphabet, and Z, as seen in Za, is a well-known symbol of support for Russia's invasion of Ukraine. *Id.*[8] A screenshot of the footage is below.




[7] Russian State TV Shows Military Ising U.S.-made Sniper Rifles and Ammunition, Despite 2014 Embargo, THE INSIDER, Feb. 3, 2025, https://theins.ru/en/news/278477 (last visited Jan. 20, 2026).

[8] *See also* El. Stern, *Weaponized Letters: The Role of Z, O, V in the Russo-Ukrainian* War, MEDIUM, Aug. 21, 2024, https://medium.com/chaos-agents/weaponized-letters-the-role-of-z-o-v-in-the-russo-ukrainian-war-c7a02304083b (last visited Jan. 20, 2026).

The Russian investigative reporting further indicated that the footage aired as part of a documentary which highlighted the role of snipers in the Russian military, focusing on the 155th Pacific Fleet Marine Brigade, which was active in key battles in Ukraine.[9] *Id.* ¶ 39.[10]

4. The Illegal Reexport of U.S. Company-3 Ammunition

As detailed in the complaint in *United States v. Gruber*, No. 25-MJ-296 (enclosed as Exhibit A), the defendant was also involved in the illegal reexport of U.S.-manufactured ammunition from Italy to Kyrgyzstan (and eventually Russia), in violation of U.S. law. In sum, between April 2024 and June 2024, the defendant, conspiring with others, placed an order and received 13,000 rounds of U.S. Company-3[11] ammunition worth $23,000 in Bishkek, Kyrgyzstan. The license for this ammunition required that the ammunition stay in Italy. Nevertheless, the defendant flouted U.S. law and reexported the U.S. Company-3 ammunition from Italy to Kyrgyzstan. U.S. Company-3 ammunition has reportedly been used in Russia's war against Ukraine.[12]

The U.S. Company-1, -2, and -3 transactions above are essentially case studies in a pattern and practice of the defendant making misrepresentations to DOC about the true end user, and illegally reexporting firearms and ammunition. The defendant followed the same pattern with other U.S. companies and has stipulated that he exported over $1,500,000 worth of U.S.-manufactured firearms and ammunition.

II. Applicable Law

It is settled law that "a district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range. As a matter of administration, and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007) (citation omitted). Next, a sentencing court should "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party. In so doing, [the court] may not presume that the Guidelines range is reasonable. [The court] must make an individualized assessment based on the facts presented." *Id.* at 49-50 (citation and footnote omitted). "When a factor is already included in the calculation of the [G]uidelines sentencing range, a judge who wishes to rely on that same factor to impose a sentence above or

---

[9] *Supra* n.7.

[10] The investigation also revealed that certain of the U.S.-made firearms parts reexported by the defendant are known to be used by Russian intelligence.

[11] U.S. Company-3, headquartered in Nebraska, is a world-leading innovator of bullet, ammunition, reloading tool, and accessory design and manufacturing.

[12] Sergey Panov, Sarah Anne Aarup, and Douglas Busvine, *How US-made Sniper Ammunition Ends Up In Russian Rifles*, POLITICO, June 19, 2023, https://www.politico.eu/article/how-us-made-sniper-ammunition-russia-rifles-weapon-ukraine-war/ (last visited Jan. 20, 2026).

below the range must articulate specifically the reasons that this particular defendant's situation is different from the ordinary situation covered by the [G]uidelines calculation." *United States v. Sindima*, 488 F.3d 81, 87 (2d Cir. 2007) (quotation omitted, alterations in original) (*superseded by statute on other grounds*). "[W]here the sentence is outside an advisory Guidelines range, the court must also state 'the specific reason' for the sentence imposed, in open court as well as in writing – 'with specificity in a statement of reasons form' that is part of the judgment." *United States v. Aldeen*, 792 F.3d 247, 251-52 (2d Cir. 2015), *as amended (*July 22, 2015) (quoting 18 U.S.C. § 3533(c)(2)) (*superseded by statute on other grounds*).

Title 18, United States Code, Section 3553(a) provides that, in imposing a sentence, a court shall consider:

> (1) the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2) the need for the sentence imposed—
>
> > (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
> >
> > (B) to afford adequate deterrence to criminal conduct;
> >
> > (C) to protect the public from further crimes of the defendant; [and]
> >
> > (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

18 U.S.C. § 3553(a).

At sentencing, "the court is virtually unfettered with respect to the information it may consider." *United States v. Alexander*, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." 18 U.S.C. § 3661.

Thus, the Court should first calculate the applicable Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts. To the extent there remain any open issues as to the correct Guidelines range, the Court should first make any necessary finding regarding the correct range. Nevertheless, however the Court arrives at the correct Guidelines range, it still must fashion a sentence that meets the criteria of Section 3553(a) under the specific facts of this case.

## III. Analysis

### A. Sentencing Calculation

Probation calculated the defendant's offense level as category 23, as follows:

| | |
|---|---|
| Base Offense Level (§ 2M5.1(a)(1)) | 26 |
| Less: Acceptance of Responsibility (§§ 3E1.1(a), (b)) | -3 |
| Total: | 23 |

PSR ¶¶ 50-59.

Based on a Criminal History Category I (*id.* ¶ 62), the defendant's Guidelines range is 46 to 57 month's imprisonment (*id.* ¶ 111).

B. A High-End Guidelines Sentence Is Appropriate

The government respectfully submits that a sentence at the high end of the Guidelines range of 46 to 57 months' imprisonment is appropriate.[13] The sentencing factors articulated in 18 U.S.C. § 3553(a) underscore the need for this sentence.

1. The Nature and Circumstances of The Offense

As an initial matter, the "nature and circumstances of the offense" are serious. The defendant exported firearms and ammunition that play a critical role in Russia's war against Ukraine. Simply put, Russia cannot manufacture the advanced firearms and ammunition at issue in this prosecution on its own. Russia needs people like the defendant to lie to DOC to procure the necessary weapons to wage its years-long war against Ukraine. The Russian forces that the defendant supplied wrought enormous harm—the devastation of the war is well documented, and the war has made the region and the world substantially less safe.

The defense makes much of the fact that the applicable Guidelines section also references terrorism. (Def. Mem. at 8-9, 20, 25.) But if a defendant were convicted of a terrorism offense under § 2M5.1(a)(1), he or she would be subjected to the terrorism enhancement and his or her Guidelines would be far in excess of this defendant's Guidelines. *See* U.S.S.G. §3A1.4 (adding an additional 12 points to the offense conduct and a mandatory Criminal History of Category VI, resulting in a Guidelines range of 292-365 months' imprisonment). The Guidelines explicitly contemplate differentiating the defendant and his support of Russia's war machine, which in turn negatively affects the national security of the United States, as detailed further below, from that of terrorism. Accordingly, the Court should set aside the defendant's argument that the Guidelines are inappropriately high. In fact, the Guidelines accurately capture the defendant's

[13] The plea agreement noted that the government intended to seek an above-Guidelines sentence pursuant to § 2M5.1 Application Note 3(B) ("In the case of a violation during time of war or armed conflict, an upward departure may be warranted."). Given that this application note has since been deleted, the government no longer recommends an above-Guidelines sentence but submits that the Court should consider the nature and destination of what was reexported in fashioning a just punishment.

conduct, which has put firearms in the hands of those the United States government has deemed should not have access to U.S.-made firearms.

The defendant also tries to minimize his conduct by noting his difficulty with English. (Def. Mem. at 22.) Notably, the defendant was arrested here in the United States traveling to attend an annual tradeshow convention in Las Vegas to meet with U.S.-manufacturers of firearms and ammunition and further his criminal scheme. There can be no doubt that the defendant understood that he was sending firearms to Russia, and that he was representing to DOC that the firearms and ammunition would stay in Kyrgyzstan.

2. Specific and General Deterrence

There is a need for both specific and general deterrence in this case. As to specific deterrence, the record suggests the defendant's primary motive for committing this crime was greed—the defendant saw a business opportunity and stepped in, indifferent to the human lives it would cost. Indeed, there is no evidence that the defendant would have stopped committing this crime, but for his arrest. A significant sentence is necessary to convey to the defendant that the perceived financial incentive of this criminal activity is outweighed by the significant consequences brought upon those who are caught. *Cf. United States v. Goffer*, 721 F.3d 113, 132 (2d Cir. 2013) (noting that white-collar crime requires punishment to ensure that the crime's risks, discounted by the possibility of not getting caught, do not leave it as "a game worth playing") (quotation marks and citation omitted); *see also United States v. Brown*, 880 F.3d 399, 405 (7th Cir. 2018) ("[W]hite-collar criminals 'act rationally, calculating and comparing the risks and rewards before deciding whether to engage in criminal activity.'" (quoting *United States v. Warner*, 792 F.3d 847, 860-61 (7th Cir. 2015)). If the defendant were to receive a lenient sentence, he may calculate that the financial rewards were worth the risk, and there will be a significant likelihood that he will resume this scheme with contacts in Russia, who remain at large. Given that the United States does not have an extradition treaty with Kyrgyzstan, it is extremely unlikely Kyrgyzstan would extradite its own national. As such, there is virtually nothing to stop the defendant from resuming his criminal enterprise which could lead to the loss of lives of innocent people.

Finally, there is a need for general deterrence. General deterrence is necessary because, unfortunately, as quickly as these prosecutions are brought, other procurement networks are setup to replace them and continue to support the Russian war effort. These procurement networks require an entire ecosystem of individuals and businesses to succeed—from the individuals who agree to acquire the goods, to the companies that sell the goods, to the freight forwarders who export the goods, to the banks that process the transactions. A significant sentence will send a powerful message to each of these links in the chain and warn them that participating in the illegal export of goods to Russia will result in imprisonment and other consequences. Indeed, even those entities and individuals who may not have been aware that their conduct was in violation of the law are more likely to engage in rigorous review of transactions and other

compliance activity if they know that the failure to do so may result in serious criminal consequences.

3. Need to Protect National Security

At bottom, the purposes of our export control laws is to protect our national security interests. But these laws are only as useful as their successful enforcement. Absent rigorous enforcement, these laws are a paper tiger. Enforcement of these laws means not only bringing criminal prosecutions, but substantial punishment for those who put our nation at risk by violating regulations meant to keep us safe.

IV. Conclusion

For the foregoing reasons, the government respectfully requests that the Court impose a sentence at the high end of the Guidelines range of 46 to 57 months' imprisonment.

Respectfully submitted,

JOSEPH NOCELLA, JR.
United States Attorney

By: /s/
Ellen H. Sise
Assistant U.S. Attorney
(718) 254-6166

cc: Clerk of the Court (HG) (by ECF and E-mail)
Defense Counsel (by ECF and E-mail)