# Exhibit A

[redacted]

NJM:EHS/TBM
F. #2024R00116

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - X

UNITED STATES OF AMERICA

- against -

MANFRED GRUBER,

Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - X

Case No. 25-MJ-00296 (CHK)

AFFIDAVIT AND COMPLAINT
IN SUPPORT OF AN APPLICATION
FOR AN ARREST WARRANT

(50 U.S.C. §§ 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b))

[redacted]

EASTERN DISTRICT OF NEW YORK, SS:

Christian Jensen, being duly sworn, deposes and states that he is a Special Agent with the Federal Bureau of Investigation, duly appointed according to law and acting as such.

In or about and between January 2023 and the present, both dates being approximate and inclusive, within the Eastern District of New York and elsewhere, the defendant MANFRED GRUBER, together with others, did knowingly and willfully conspire to violate and to cause one or more violations of licenses, orders, regulations and prohibitions issued under the Export Control Reform Act, Title 50, United States Code, Sections 4801 *et seq.*

It was a part and an object of the conspiracy that the defendant MANFRED GRUBER, together with others, would and did agree to export or reexport and cause to be exported or reexported from the United States to Kyrgyzstan ammunition on the Commerce Control List, as set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1, without having first obtained a license for such export from the U.S. Department of Commerce.

(Title 50, United States Code, Sections 4819(a)(1), 4819(a)(2)(A)-(G) and 4819(b))

1. The source of your deponent's information and the grounds for his belief are as follows:[1] I am a Special Agent with the Federal Bureau of Investigation and have been since 2018. I am responsible for conducting and assisting in investigations into the activities of individuals and criminal groups responsible for the unlawful proliferation of sensitive and military technologies, export control violations, and espionage by foreign governments and related criminal and counterintelligence activity. Through my training, education and experience, I am familiar with the techniques and methods of operation used by individuals involved in intelligence and criminal activities to conceal their behavior from detection by law enforcement authorities. I have participated in numerous investigations, during the course of which I have conducted physical and electronic surveillance, interviewed witnesses, examined financial records, executed court-authorized search warrants and used other techniques to secure relevant information.

2. I am familiar with the facts and circumstances set forth below from my participation in the investigation; my review of the investigative file; and from reports of other law enforcement officers involved in the investigation.

I. The Export Control Reform Act and Export Administration Regulations

3. On August 13, 2018, the President signed into law the National Defense Authorization Act of 2019, which included the Export Control Reform Act ("ECRA"). *See* 50 U.S.C. § 4801 *et seq.* ECRA provided permanent statutory authority for the Export Administration Regulations ("EAR"), Title 15, Code of Federal Regulations, Parts 730-774.

4. ECRA provided that "the national security and foreign policy of the United States require that the export, reexport, and in-country transfer of items . . . be controlled."

---

[1] Because the purpose of this Complaint is to set forth only those facts necessary to establish probable cause to arrest, I have not described all the relevant facts and circumstances of which I am aware.

[redacted]



50 U.S.C. § 4811. To that end, ECRA granted the President the authority to "control the export, reexport, and in-country transfer of items subject to the jurisdiction of the United States, whether by United States persons or foreign persons." 50 U.S.C. § 4812. ECRA defined a "reexport" to include shipment of an item subject to the EAR from one foreign country to another foreign country. 15 C.F.R. § 734.14. ECRA granted to the Secretary of Commerce the authority to establish the applicable regulatory framework. 50 U.S.C. § 4813.

5. Through the EAR, the U.S. Department of Commerce's ("DOC") Bureau of Industry and Security ("BIS") reviewed and controlled the export of certain items from the United States to foreign destinations. In particular, BIS placed restrictions on the export and reexport of items that it determined could make a significant contribution to the military potential of other nations or that could be detrimental to the foreign policy or national security of the United States. Under the EAR, such restrictions depended on several factors, including the technical characteristics of the item, the destination country, the end user and the end use of the item.

6. The most sensitive items subject to EAR controls were identified on the Commerce Control List ("CCL") set forth in Title 15, Code of Federal Regulations, Part 774, Supplement Number 1. Items listed on the CCL were categorized by Export Control Classification Number ("ECCN"), each of which was subject to export control requirements depending on destination, end use and end user of the item.

7. An exporter generally was required to file Electronic Export Information ("EEI") through the Automated Export System where, among other reasons, an export license was required, or the value of the commodity being exported was more than $2,500. 15 C.F.R. § 758.1. The EEI required an exporter to list, among other things, the destination country, the ultimate

consignee's name and address, the intermediate consignee's name and address, and a description of the commodity to be exported. Failure to file EEI or providing false or misleading information in EEI was a violation of ECRA (*see, e.g.*, 50 U.S.C. 4819(a)(2)(F)), the EAR (*see* 15 C.F.R. Part 758), 13 U.S.C. § 305, and the Foreign Trade Regulations (*see* 15 C.F.R. Part 30).

8. Under ECRA, it was a crime to willfully violate, attempt to violate, conspire to violate or cause a violation of any regulation, order, license or authorization issued pursuant to the statute, including the EAR. *See* 50 U.S.C. § 4819(a)(1).

II. The Defendant and Related Entities

9. The defendant MANFRED GRUBER is a citizen of Italy. GRUBER is the Director of Sales for Italian Company-1, a large wholesale distributor of various products for hunting, optics and archery.

10. Co-Conspirator-1 is a Kyrgyz-based arms and ammunition dealer.

11. Co-Conspirator-2 is an Italian-based arms and ammunition dealer for Italian Company-2, an Italian arms dealer which bills itself as having an "import-export business on a global scale, creating significant trade relations all over the world."

III. The Criminal Scheme

12. The defendant MANFRED GRUBER, together with others, exported from the United States to Kyrgyzstan ammunition that required a license from DOC. As described herein, GRUBER used a cutout company, Italian Company-2, to reexport American-made ammunition to Kyrgyzstan, in violation of licenses which prohibited such reexports. This American-made ammunition appears to have been further reexported to Russia, as discussed below. Notably, Kyrgyzstan increased its firearms-related imports following Russia's February 2022 invasion of Ukraine. For example, Kyrgyzstan, which did not import any firearms from

Italy in 2020 or 2021, imported 882 rifles in 2022 and 4,434 in 2023, around the time and following Russia's February 2022 invasion of Ukraine.

IV. <u>The Defendant's Use of Italian Company-2 as a Cutout Company</u>

13. On or about December 17, 2022, MANFRED GRUBER, on behalf of Italian Company-1, entered into a purchase agreement to sell hunting, sporting, service guns, ammunition and accessories to Kyrgyz Company-1 for approximately one year, until December 23, 2023. The purchase agreement indicated that Kyrgyz Company-1 was located at an address in Bishkek, Kyrgyzstan.

14. On or about December 22, 2022, MANFRED GRUBER was introduced via email to Co-Conspirator-1, a Kyrgyz-based arms dealer associated with Kyrgyz Company-1 and Kyrgyz Company-2. Both Kyrgyz Company-1 and -2 are arms dealers based in Bishkek, Kyrgyzstan. Kyrgyz Company-2 is closely associated with Sergei Zharnovnikov. *See United States v. Zharnovnikov*, 25-CR-45 (HG) (E.D.N.Y.).[2] Kyrgyz Company-2 is owned in part by Zharnovnikov's spouse.

15. On or about January 4, 2023, MANFRED GRUBER emailed Co-Conspirator-1 an invoice for magazines[3] reflecting that Italian Company-1 sold magazines to Kyrgyz Company-1. The invoice indicated that Kyrgyz Company-1 had an address in Bishkek, Kyrgyzstan.

16. On or about January 25, 2023, MANFRED GRUBER emailed Co-Conspirator-1. GRUBER stated that he was not allowed to reexport certain firearms that were

---

[2] On June 25, 2025, Zharnovnikov pleaded guilty to conspiracy to violate ECRA for his role in exporting U.S.-made firearms to Russia.

[3] A magazine is the device that stores and feeds ammunition into a repeating firearm, using a spring and follower to push rounds into the firearm's chamber.

manufactured in the Czech Republic, but he further indicated that, "if it's ok for you I will forward the request to [Italian Company-2] and do my best that he will offer you a 'nice' pricing. Let me know if you agree."

17. On or about February 8, 2023, Co-Conspirator-1 wrote to MANFRED GRUBER, "Dear Manfred, Do you have a WhatsApp or Telegram number? So we can chat not via official emails :)" On or about February 8, 2023, GRUBER responded "yes sir!" and sent his telephone number. Based on my training and experience, I know that individuals engaged in criminal conduct will often move conversations from accounts hosted by U.S.-based email providers (which Co-Conspirator-1 had) to encrypted communication platforms such as WhatsApp or Telegram to prevent law enforcement authorities from intercepting the content of the communication, as Co-Conspirator-1 proposed here. Based on GRUBER's response, I understand that the co-conspirators likely continued their criminal exchange using an encrypted communications platform.

18. Email records reflect that, as MANFRED GRUBER proposed in his January 25, 2023, email, the conspirators used Italian Company-2 as a cutout to obscure GRUBER's involvement in the illegal procurement network. For example, on or about February 13, 2023, Co-Conspirator-1 wrote to GRUBER, "Can you please let me know if you can make me an offer through [Italian Company-2]?" Based on context and my investigation, I understand that in this email, Co-Conspirator-1 asked GRUBER to quote a price for ammunition that GRUBER was not allowed to provide to Co-Conspirator-1 directly.

19. As further described below, thereafter, MANFRED GRUBER sold ammunition to Italian Company-2, which in turn sold the ammunition to Co-Conspirator-1. GRUBER used Italian Company-2 as a cutout, thereby selling American-made ammunition to

Kyrgyzstan in violation of DOC licenses which required that the American-made ammunition stay in Italy.

V. U.S. Company-1 Reexports

20. U.S. Company-1, headquartered in Grand Island, Nebraska, is a world-leading innovator of bullet, ammunition, reloading tool, and accessory design and manufacturing.

21. U.S. Company-1 had a license to lawfully export ammunition to Italian Company-1. Pursuant to that license, the U.S. Company-1 ammunition could not be reexported out of Italy, subject to certain exceptions not applicable here. U.S. Company-1 ammunition was controlled at all relevant times under ECCN 0A505.a (ammunition).

22. On or about April 10, 2024, Co-Conspirator-2 messaged MANFRED GRUBER, forwarding a communication from Co-Conspirator-1, "Can you please send me the list of cartridges that are in your and Manfred's stock (.22, .308, .300wm, 6.5, .338LM,)? Also what [Finnish-Norwegian Company-1] bullets can you offer? Send me stock cartridges please." The next day, GRUBER responded, "I sent you four emails."

23. On or about April 15, 2024, Co-Conspirator-2 sent Co-Conspirator-1 four excel files detailing Italian Company-1's current stock of ammunition from four different brands, including U.S. Company-1. Based on the timing and content, it appears that Co-Conspirator-2 forwarded along the four emails MANFRED GRUBER had sent Co-Conspirator-2 a few days prior. The same day, Co-Conspirator-1 forwarded the same four excel files to Zharnovnikov. Zharnovnikov responded and placed an order with Co-Conspirator-1 for over 13,000 cartridges[4]

---

[4] A cartridge is a complete unit of ammunition containing the bullet, gunpower and primer, all enclosed within a case.

of U.S. Company-1 ammunition (the "Zharnovnikov Order") worth approximately $23,000. Also on April 15, 2024, Co-Conspirator-1 in turn placed the Zharnovnikov Order with Co-Conspirator-2.

24. On or about April 22, 2024, Co-Conspirator-2 emailed MANFRED GRUBER regarding the Zharnovnikov Order, noting that Co-Conspirator-1 "confirmed . . . [for] [U.S. Company-1] cartridges."

25. On or about May 14, 2024, Co-Conspirator-2 sent Co-Conspirator-1 a picture and indicated, "Your ammo ready. Please Pay." The picture depicted a shipping label from Italian Company-1. In response, Co-Conspirator-1 asked if it was U.S. Company-1 ammunition, and Co-Conspirator-2 confirmed that it was.

26. On or about June 3, 2024, Co-Conspirator-1 sent Zharnovnikov emails reflecting that the U.S. Company-1 ammunition had shipped from Italy to Baku, Azerbaijan, and eventually Bishkek.

27. In other words, MANFRED GRUBER, as Director of Sales for Italian Company-1, sold U.S. Company-1 cartridges to Italian Company-2, which in turn sold to Zharnovnikov—convicted of an ECRA conspiracy for procuring firearms for Russia—in Kyrgyzstan, in violation of the U.S. Company-1 license, which required that the cartridges remain in Italy.

28. Other communications and records indicate that MANFRED GRUBER sold Co-Conspirator-2 U.S. Company-1 ammunition, totaling over 400,000 rounds, worth over $460,000, which Co-Conspirator-2 reexported out of Italy, in violation of the U.S. Company-1 license.

29. A contract found on Zharnovnikov's phone indicated that he had contracted with a Russian-based company for some of the same ammunition.

30. On or about August 21, 2025, MANFRED GRUBER was issued a ticket to fly from Venice, Italy, to Grand Island, Nebraska, the city in which U.S. Company-1 is located, on or about October 12, 2025. On the same day, a return ticket was issued to GRUBER to fly from Grand Island, Nebraska to Venice, Italy on or about October 16-17, 2025. Based on my training and experience and my familiarity with the investigation, I assess that GRUBER is traveling to the United States to meet with U.S. Company-1.

VI. U.S. Company-2 Reexports

31. U.S. Company-2 is an American manufacturer of firearms and ammunition located in Tennessee.

32. U.S. Company-2 had a license to lawfully export ammunition to Italian Company-1. Pursuant to that license, the U.S. Company-2 ammunition could not be reexported out of Italy, subject to certain exceptions not applicable here. U.S. Company-2 ammunition was controlled at all relevant times under ECCN 0A505.a (ammunition).

33. On or about May 1, 2024, U.S. Company-2 sold 4,000 rounds of .416 452 GR ammunition to Italian Company-1, which shipped on May 31, 2024. MANFRED GRUBER was listed on the end-use statement provided by U.S. Company-2 to DOC. The end-use statement indicated that the purpose for which the items would be used was "commercial resales to authorized Italian dealers in the territory of Italy." The item number listed on the Italian Company-1 payment is "812535." This shipment was made from John F. Kennedy International Airport, in the Eastern District of New York.

34. On or about November 18, 2024, Co-Conspirator-1 placed an order for the same caliber and grain ammunition with Co-Conspirator-2. Text messages between Co-Conspirator-1 and Co-Conspirator-2 indicate that this ammunition was coming from MANFRED GRUBER, at Italian Company-1, to Co-Conspirator-1 in Kyrgyzstan. Notably, Italian Company-2 used the same number "812535" on its invoice to Kyrgyzstan Company-2 for the same .416 452 GR ammunition as Italian Company-1 did on its payment to U.S. Company-2.

VII. GRUBER's Knowledge That He Was Violating Export Laws

35. Records demonstrate that MANFRED GRUBER was aware that U.S. law prohibited the reexport of U.S. ammunition without further licensing, which he did not obtain. For example, on or about May 1, 2024, U.S. Company-2 sent an invoice to Italian Company-1 for the purchase of hundreds of rounds of ammunition, to the attention of GRUBER, with Italian Company-1 listed as the ultimate consignee and no company listed as an intermediate consignee. The invoice expressly stated:

> These items are controlled by the U.S. Government and authorized for export only to the country of ultimate destination for use by the ultimate consignee or end-user(s) herein identified. They may not be resold, transferred, or otherwise disposed of, to any other country or to any other person other than the authorized ultimate consignee or end-user(s)[] either in their original form or after being incorporated into other items[] without first obtaining approval from the U.S. government or as otherwise authorized by U.S. law and regulations.

36. Additionally, WhatsApp communications demonstrate that MANFRED GRUBER was aware that ammunition was going to Russia and took steps to disguise the full arc

of its travel. In WhatsApp exchanges on or about September 23, 2023, MANFRED GRUBER exchanged the following messages with Co-Conspirator-2:[5]

| | |
|---|---|
| Co-Conspirator-2: | Approximately 100,000 [U.S. Company-1] 375 390GR A-TIP [bullets]<br>What delivery time do we have?<br>More balls... |
| GRUBER: | 😂😂😂they give me an answer in a few days... you have to give them everything at once? I ask because of the possible destination.... They caught the Slovenian [U.S. Company-1] distributor who had triangulated with Russia... FBI International |
| Co-Conspirator-2: | No, this request is from an Armenian customer.<br>We can even split up the shipment |
| GRUBER | I'd say that would be better, so it goes unnoticed. 😉 |

37. The defendant MANFRED GRUBER did not apply for, obtain, or possess a license to export or reexport ammunition to Kyrgyzstan.

WHEREFORE, your deponent respectfully requests that an arrest warrant be issued for the defendant MANFRED GRUBER, so that he may be dealt with according to law.

IT IS FURTHER REQUESTED that this Court issue an order sealing, until further order of the Court, all papers submitted in support of this application, including this Affidavit and any arrest warrants issued, with the exception that the complaint and arrest warrant can be unsealed for the limited purpose of disclosing the existence of, or disseminating, the complaint and/or arrest warrant to relevant United States, foreign or intergovernmental authorities, at the discretion of the United States and in connection with efforts to prosecute the defendant or to secure the defendant's arrest, extradition or expulsion. Based on my training and experience, I have learned that criminals actively search for criminal affidavits on the Internet and disseminate them to other

[5] Communications between GRUBER and Co-Conspirator-2 took place in Italian. The English translations herein are draft translations.

criminals as they deem appropriate, such as by posting them publicly through online forums. Premature disclosure of the contents of this Affidavit and related documents will seriously jeopardize the investigation, including by giving targets an opportunity to flee or continue flight from prosecution, destroy or tamper with evidence, change patterns of behavior, and notify confederates.

[redacted]

Christian Jensen
Special Agent
Federal Bureau of Investigation

Sworn to before me telephonically this 7th day of October, 2025

[redacted]

HONORABLE CLAY H. KAMINSKY
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK